**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO**

GARY DINKEL,

       Plaintiff,

v.   No. Civ. 09-388 LH/RHS

CRANE CARE, INC.,

       Defendant.

### MEMORANDUM OPINION AND ORDER

On June 3, 2010, Defendant Crane Care, Inc. ("Crane Care") filed a Motion for Partial Summary Judgment on Punitive Damages (Doc. 80) and Memorandum in Support (Doc. 81). The Court, having considered the motion, briefs, evidence, arguments, relevant law, and otherwise being fully advised, finds that the motion should be **denied.**

### I.   FACTUAL BACKGROUND

Viewed in the light most favorable to the Plaintiffs, the facts presented to this Court are as follows:

On or about September 9, 2005, GCC Rio Grande of America ("GCC") contracted with Crane Care to perform an electrical controls conversion for a Ball Mill Room Bridge Crane ("the crane") located at GCC. (Def.'s Mot. For Partial Summ. J. (Doc. 81) ("Def.'s MSJ"), at Undisputed Fact ("UF") ¶ 2.) Crane Care's conversion of the crane included the replacement of the existing cab controls with radio remote controls. (*Id*.) Julio Antillon of Crane Care was responsible for the installation of the remote controller system. (*Id*. ¶ 3.)

Although Crane Care did not provide formal on-site training for GCC employees after the electrical controls conversion, employees of Crane Care did show at least some GCC employees how to operate the remote controllers and the pendant controller, a controller that is affixed and

hard-wired to the crane.  (Def.'s MSJ, Ex. 2, at 130:6-16; 134:17-25; 135:1-3; 136:19-25; 137:11-13.)  A representative of Crane Care explained to GCC personnel the purpose of the nine buttons on the newly-installed controllers and demonstrated how to use them to change the speed of the crane.  (*Id*. 137:1-13.)  The GCC electrical team trained GCC supervisors on the operation of the controllers, and the supervisors, in turn, trained other GCC personnel.  (Def.'s MSJ, UF ¶ 6.)

On January 6, 2006, after completion of the electrical controls conversion of the crane, Mr. Antillon operated the crane and performed an inspection and load test.  (*Id*. ¶ 4.)  The radio remote controller worked properly and stopped the crane each time it was tested.  (*Id*.)  Therefore, Mr. Antillon rendered the equipment safe to operate.  (*Id*.)  Crane Care knew that a remote control that malfunctioned or that failed to stop a crane's hoist on command would create an unsafe and dangerous risk to others.  (Pl.'s Resp. to Def.'s Mot. for Partial Summ. J. (Doc. 82) ("Pl.'s Resp."), at Additional Undisputed Fact ("AUF") ¶ 3.)  The installation of the equipment came with a two-year warranty, and Crane Care was therefore responsible for making warranty calls at GCC related to the installed equipment during the warranty period.  (Def.'s MSJ, UF ¶ 7.)

According to Plaintiff, approximately three weeks to one month prior to his injuries, he experienced problems with the crane and the remote control.  (Pl.'s Resp., Ex. C, at 54:17-25; 55:1-13.)  Plaintiff estimated that these problems occurred five or six times during the course of five days.  (*Id.*)  Primarily, the problem was that the hoist would not go up or down; sometimes it would not stop.  (*Id*. 55:20-21.)  Plaintiff indicated that when he and other crane operators encountered problems with the crane, they would go to the electrical supervisor, who would look at the crane or call "the contractor" out to look at it.  (*Id*. 56:13-18.)

Approximately one month prior to the accident involving Plaintiff, on or about January 26, 2006, GCC notified Crane Care that one of the two remote controllers would not operate the crane.

(*Id*. ¶ 10.) According to Joe Vanderlugt, Vice President of Crane Care, after determining that the problem was not with the batteries, Crane Care returned the remote controller to the manufacturer. (*Id*.) The manufacturer repaired the remote controller by replacing the coder and returned it to Crane Care. (*Id*.)

Next, on or about February 13, 2006, Crane Care was notified that the crane would not operate. (*Id*. ¶ 11.) Mr. Antillion went to GCC and determined that the batteries in the remote controller needed to be replaced. (*Id*.) After replacing the batteries, Mr. Antillon tested the remote controller and determined that it was working properly. (*Id*.)

Nine days later, on February 22, 2006, GCC contacted Crane Care about a problem with the crane's selector switch, a switch that allows the operator of the crane to select whether the crane is controlled via remote control or via the hard-wired pendant controller affixed to the crane. (Def.'s MSJ, UF ¶ 12); (Def.'s MSJ, Ex. 1, at 59:18-25; 60:1-3.) Mr. Antillon determined that fine cement dust had worked its way into the electrical components of the switch, impairing its operation. (Def.'s MSJ, UF ¶ 12.) Mr. Antillon replaced the selector switch and tested the crane using both the remote controller and the pendant controller. (*Id*.); (Def.'s MSJ, Ex. 1, at 50:5-10.) According to Mr. Antillon, the crane "went through its normal parameters of functions." (Def.'s MSJ, UF ¶ 12.)

The next day, on February 23, 2006, Plaintiff was working with the crane to remove a mill man head. (Def.'s MSJ, UF ¶ 19.) According to Plaintiff, early that morning the remote controller did not properly move the hoist up or down, and Jesus Urbina, the Electrical Supervisor at GCC, called "the people that installed the remote." (*Id*. ¶ 21.) Someone came out to GCC to look at the crane that morning, but Plaintiff did not know who it was and could not describe them. (Def.'s MSJ,

Ex. 5, at 58:1-19.)  Meanwhile, Michael Bohl, the Mill Team Supervisor at GCC, directed Plaintiff to a different project away from the crane. (*Id*. 58:15-17.)  Eventually, Mr. Bohl instructed Plaintiff to return to his work on the crane. (*Id*. 58:15-18).  According to Plaintiff, while he was working with the crane, the crane operator, Orlando Sanchez, hit the stop button on the remote controller, but the hoist failed to respond.   (Def.'s MSJ, UF ¶ 20.)  Plaintiff's fingers were caught in the cable, resulting in the partial amputation of several of his fingers and injuries to his shoulder. (Def.'s MSJ, Ex. 5, at 58:15-18.)

Mr. Antillon, the Crane Care service technician who installed and tested the remote controller system, who replaced batteries in one remote, and who replaced the crane's selector switch, testified that prior to the accident involving Plaintiff, he had not heard and was not otherwise aware of any problem with the crane's hook or hoist failing to stop when the remote control system was being used. (Def.'s MSJ, Ex. 1, at 48:18-25; 49:1-10.)[1]  At the time of his service calls to GCC, there was no indication to him of a drifting problem when operating or testing the crane.  (*Id*.)

As a general matter, problems related to the use of the crane or the remote controllers were reported to either Mr. Bohl or Mr. Urbina, both of GCC.  (*Id*. ¶¶ 8, 9.)  Mr. Urbina was responsible for relating problems with the crane to Crane Care.  (*Id*. ¶ 8.)  According to Mr. Urbina, Crane Care always addressed the problems that he reported "immediately" and always repaired the issue to his

---

[1] Plaintiff attempts to dispute Mr. Antillon's testimony that he was not aware of a drifting problem prior to Plaintiff's accident by referring the Court to the deposition testimony of George Hackworth.  According to Plaintiff, Mr. Hackworth "testified as to Crane Care's knowledge of the crane's drifting problem." (Pl.'s Resp. 3.)  In fact, Mr. Hackworth's testimony was that he was called into GCC "later on, on [his] own" because the crane was drifting. (Pl.'s Resp., Ex. B, at 7:15-18; 15:2-5.)  Significantly, though, Mr. Hackworth was not called into GCC to address the crane's drifting until May 19, 2006 and May 22, 2006, three months *after* the accident involving Plaintiff. (Def.'s Reply, Ex. 6, 23:19-25; 24:1-25; 25:1-8.)  Even viewing the evidence in the light most favorable to Plaintiff, the referenced testimony of Mr. Hackworth does not directly contradict Mr. Antillon's testimony that he was not aware of drifting problems with the crane prior to the accident involving Plaintiff.

satisfaction.  (*Id.*)   Neither Mr. Bohl nor Mr. Urbina recalled any problem with the crane's remote controllers, other than the problem with the batteries.  (*Id.* ¶ 14-15.)  More specifically, Mr. Urbina testified that he was not aware of any problem in which GCC personnel had problems getting the hoist to stop or to move up or down.[2]  (*Id.* ¶ 15.)

On the other hand, George Hackworth, a former service technician with Crane Care, testified that the crane did have "a problem with drifting," such that the up and down hoist did not stop moving when the operator stopped pressing the directional button on the remote controller.  (Pl.'s Resp., Ex. B, at 7:14-24.)  Mr. Hackworth recalled people discussing the drifting of the crane, (*id.* 17:13-16), and, at some point, Mr. Hackworth personally observed the crane drift after it should have stopped, (*id.* 14:4-5).  However, Mr. Hackworth was not sent to GCC specifically to address the crane's drifting problem until May 19, 2006 and May 22, 2006, three months *after* the accident involving Plaintiff.  *Compare* (Def.'s Reply, Ex. 6, at 14:20-25; 15:1-5; 23:17-24; 24:14-20) *with* (Second Amended Complaint ¶ ¶ 25- 29).

After troubleshooting the crane at GCC in May 2006, again approximately three months after the accident involving the Plaintiff, Mr. Hackworth determined that the crane's drifting problem was the  result of the encoder not being grounded.  (Pl.'s Resp., Ex. B, at 9:22-25; 10:1-12); (Def.'s

---

[2] Plaintiff refers to deposition testimony of Mr. Hackworth in which he claims that Mr. Urbina told him that he was becoming upset with Crane Care, because the crane had been continuously malfunctioning for a year. (Pl.'s Resp., Ex. B, at 42:2-8.)  Defendant argues that the statement by Mr. Urbina is inadmissible hearsay.  In reaching its decision herein, the Court has not considered this particular testimony of Mr. Hackworth.  First, it is unclear whether the statement was made by Mr. Urbina to Mr. Hackworth before or after the accident involving Plaintiff.  Given that Mr. Hackworth was not sent to GCC to address the crane's drifting problem until three months *after* the accident, though, it seems probable that the statement was made *after* the accident.  As such, the statement could only be relevant to GCC's pre-accident knowledge of problems with the crane, but would not tend to show that Crane Care had prior knowledge of an ongoing drifting problem with the crane.  Moreover, offered to establish that the crane in fact continuously malfunctioned for a year, the statement constitutes hearsay.  Accordingly, viewing the evidence in the light most favorable to Plaintiff, the Court concludes that the statement is inadmissible.

Reply, Ex. 6, at 23:17-22; 25:4-8.)   It was Mr. Hackworth's understanding that the grounding problem had existed for "awhile."  (Pl.'s Resp., Ex. B, at 14:3-9.)  Indeed, he was told by either the manager or assistant manager of Crane Care that the crane had been drifting "for about a year . . . ever since they installed the conversion."³  (*Id*. 15:6-24).

---

³ Although neither Plaintiff nor Defendant have specifically cited this particular portion of Mr. Hackworth's deposition testimony, both parties have included the testimony in, and not redacted it from, the materials they provided to the Court as exhibits to their respective briefs.  (*See* Def.'s Reply, Ex. 6); (*See* Pl.'s Resp., Ex. B).  The Court believes that this testimony provides necessary context for those portions of testimony that have been referenced by the parties.  For instance, Plaintiff cites Mr. Hackworth's testimony several lines earlier, where he indicated that he was told that he was going out to GCC because the crane was drifting (*see* Pl.'s Resp., Ex. B, at 15:2-5).  However, the testimony referenced by Plaintiff does not suggest who told Mr. Hackworth about the drifting and, likewise, does not address his understanding of how long the crane had been drifting, which are both critical pieces of information in assessing a punitive damages claim against Crane Care.  Accordingly, in this instance, the Court will exercise its discretion to consider the deposition testimony immediately surrounding the referenced testimony to provide necessary context.  *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-73 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of [submitted] materials, but is not required to do so.")

With regard to similar testimony by Mr. Hackworth, Defendant has argued that out-of-court statements made to Mr. Hackworth regarding the ongoing nature of the drifting problem were inadmissible hearsay.  (*E.g*., Def.'s Reply 2) (arguing that a statement to Mr. Hackworth suggesting that the crane had a drifting problem for "awhile" was inadmissible hearsay).  Significantly, however, the primary relevance of statements to Mr. Hackworth about the ongoing nature of the drifting problem is as evidence of Crane Care's knowledge or notice of the purported drifting problem.  When offered to show Crane Care's knowledge, rather than to show that there was in fact a drifting problem, the evidence does not meet the definition of hearsay.  *See* Fed. R. Civ. P. 801(c).

Moreover, under Fed. R. Civ. P. 801(d)(2), a statement offered against a party that is a "statement by the party's agent or servant concerning a matter within the scope of agency or employment, made during the existence of the relationship" constitutes non-hearsay.  Fed. R. Civ. P. 801(d)(2).  Although it is not possible to determine conclusively from the deposition transcript excerpt who told Mr. Hackworth that the drifting problem had been occurring since the electrical controls conversion, viewing the evidence in the light most favorable to Plaintiff, the statement was made by either the manager or assistant manager of the company.  (*See* Pl.'s Resp., Ex. B, at 15:2-25.)  It would seem that the statement concerns a matter within the scope of employment for either member of the company's upper management.  *Cf. Rainbow Travel Serv. v. Hilton Hotels Corp*., 896 F.2d 1233 (10th Cir. 1990) (holding that the district court did not abuse its discretion when it admitted a shuttle bus driver's statements concerning his employing hotel's reservation practices as statements made within the scope of the driver's agency, even though the driver was not involved in the decision-making process regarding hotel reservations).  As such, the statement constitutes non-hearsay under Fed. R. Civ. P. 801(d)(2) when offered against Crane Care.  Thus, the statement is admissible, even as evidence that the crane in fact had problems with the drifting from the time of the electrical controls conversion, though its primary relevance at this stage of proceedings is as evidence of Crane Care's knowledge.

## II.     STANDARD OF REVIEW

An important function of summary judgment is to eliminate factually-unsupported claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Here, Crane Care is seeking summary judgment in its favor on Plaintiff's punitive damages claim. Crane Care was also recently granted leave to file an additional dispositive motion regarding causation, which has not yet been filed. (*See* Doc. 89.)

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Id.* (internal quotations omitted).

Initially, the moving party bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.    LEGAL ANALYSIS

Crane Care's argument in support of its motion for partial summary judgment on Plaintiff's

punitive damages claim is two-fold. First, Crane Care argues that Plaintiff has failed to submit evidence from which a jury could find that Crane Care acted with a culpable mental state. Second, it contends that Plaintiff has not submitted evidence of either authorization, participation, or ratification of wrongful acts by a Crane Care employee or, alternatively, wrongful acts by an employee acting in a "managerial capacity."

### A. Evidence of Culpable Mental State

Under New Mexico substantive law, in order to survive a motion for summary judgment on the issue of punitive damages, a plaintiff must submit evidence from which a jury can find that the defendant acted with a culpable mental state that rose to the level of conduct that was "willful, wanton, malicious, reckless, oppressive, or fraudulent." *McNeill v. Rice Eng'g and Operating, Inc.*, 70 P.3d 794, 802 (N.M. Ct. App. 2003); N.M. U.J.I. Civ. 13-1827. As the New Mexico Supreme Court clarified in *Paiz v. State Farm Fire & Cas.*, 880 P.2d 300 (1994), the imposition of punitive damages requires more than negligence, or even gross negligence, on the part of the defendant. *Id.* at 308. Rather "*a positive element of conscious wrongdoing is always required*. It must be shown either that the defendant was actuated by ill will, malice, or evil motive . . . , or by fraudulent purposes, or that he was so wanton and reckless as to evince a *conscious disregard* of the rights of others." *Id.* (internal citation and quotation marks omitted) (emphasis in original). At minimum, then, Plaintiff must come forward with evidence that Crane Care acted with "reckless disregard" – that is, that it knew of potential harm to the interests of Plaintiff but nevertheless "utterly fail[ed] to exercise care" to avoid the harm. *See id.*

Plaintiff's Second Amended Complaint alleges that "Defendant Crane Care's acts or omissions . . . were malicious, willful and/or reckless displaying a conscious, deliberate or reckless

disregard of, or utter indifference to, harmful consequences, including the health and safety of Gary Dinkel and other persons, and resulting in the injuries suffered by Plaintiff." (Second Amended Complaint ¶ 108.)

Though the evidence does not suggest that Crane Care or any of its employees intentionally caused Plaintiff's injuries, the question of whether Plaintiff has raised a question of fact as to recklessness is a closer question. Notably, the risk of danger posed by the particular product at issue can be considered in determining whether a defendant's conduct rises to the level of recklessness. *Clay v. Ferrellgas*, 881 P.2d 11, 14 (N.M. 1994). Indeed, as the risk of danger increases, conduct that amounts to a breach of duty is more likely to demonstrate a culpable mental state in support of punitive damages. *Id.* at 14. Here, there is no question that a drifting crane, or one that fails to respond to commands administered remotely, would create an unsafe and dangerous situation for those working with or around the crane. Crane Care readily admits as much. (Pl.'s Resp., AUF ¶ 3); (Def.'s Reply 4).

In cases involving the alleged malfunction of products or equipment, the defendant's knowledge of the product's alleged defect is a particularly important factor with respect to the punitive damages claim. After all, "[a] defendant that is unaware of a product's defect can hardly 'consciously' or 'recklessly' disregard any other party's rights." *Faniola v. Mazda Motor Corp.*, 02cv1011 JB/RLP, 10 (D.N.M. April 30, 2004) (citing 1 J. Kircher & C. Wiseman, Punitive Damages: Law and Practice § 6.21 (2000)). Generally speaking, in cases such as this, punitive damages are not awarded where there is either no awareness of a product defect or no awareness of the serious danger of substantial harm posed by that defect. *See id.*

Plaintiff claims that Crane Care was fully aware of a drifting problem with the crane, and

the dangerous situation that it created for Plaintiff and other GCC employees, but yet failed to remedy it. Concisely, and drawing on inferences in Plaintiff's favor, his case for recklessness is as follows:

According to George Hackworth, a grounding problem with the encoder on the crane, which caused the crane to drift, existed for "awhile." Although Mr. Hackworth was not sent to GCC to address the crane's drifting problem until approximately three months *after* the accident involving Plaintiff, either Crane Care's manager or its assistant manager told him that the crane had been drifting since Crane Care performed the electrical controls conversion, which occurred in September 2005. Mr. Hackworth heard people talking about how the crane would drift and personally saw it drift.

Additionally, three weeks to one month prior to Plaintiff's injuries, Plaintiff observed problems with the operation of the crane on five to six occasions, including the failure of the hoist to go up or down or to stop when commanded to do so. When Plaintiff and other crane operators observed these problems, they would notify GCC's electrical supervisor, Jesus Urbina, who would either look at the crane or contact Crane Care to service the crane. On the morning of the accident, the crane once again did not properly respond to the remote controller, and Crane Care was contacted. Later that day, after Plaintiff was instructed to resume his work on the crane, the crane did not respond when the operator pressed the stop button, and Plaintiff suffered injuries as a result.

Crane Care maintains that these facts are insufficient to allow the issue of punitive damages to go to a jury. Ultimately, the Court concludes – again, viewing the evidence in the light most favorable to Plaintiff – that there is a question of fact as to whether Crane Care acted recklessly. Because the risk of danger from a drifting crane may be great, it becomes easier for Plaintiff to

establish that a breach of duty by Crane Care amounted to recklessness. *See Clay*, 881 P.2d at 14. Plaintiff has presented evidence, though not undisputed evidence, from which an inference could be drawn that Crane Care was aware, prior to the accident involving Plaintiff, that the crane and/or remote control was malfunctioning in a manner that made it probable that someone working with or around the crane would suffer injury and yet failed to cure the malfunction. As such, genuine issues of material fact exist concerning Crane Care's culpability, which the Court may not resolve on summary judgment. *See Dugan v. EMS Helicopters, Inc.*, 915 F.2d 1428, 1431 (10th Cir. 1990) (concluding that the district court did not abuse its discretion in submitting the issue of punitive damages to the jury, where the evidence showed that the corporate defendant dismissed concerns from flight nurses regarding the condition of its helicopters and failed to attend meetings designed to discuss those concerns).

### B. Vicarious Liability

Plaintiff's Second Amended Complaint alleges that

> Defendant Crane Care is *vicariously liable* for punitive damages based on the conduct of its employees, officers, principals, vice-principals and agents who were acting in the scope and course of their employment with Crane Care and had sufficient discretionary authority to speak and act for it with regard to the conduct at issue, independent of higher authority.

(Second Amended Complaint ¶ 109) (emphasis added).

Even when a defendant is not directly liable for punitive damages, it may still be vicariously liable based on the conduct of an employee. *See* N.M. U.J.I. 13-1827. To hold Crane Care vicariously liable for the action(s) of a Crane Care employee, the employee's conduct must have reached the level of a culpable mental state for which punitive damages may be awarded, and either 1) Crane Care must have authorized, ratified, or participated in

the conduct, or 2) the culpable employee must have acted in a managerial capacity and in the scope of his or her employment. *See Albuquerque Concrete Coring Co., Inc. v. Pan Am. World Servs., Inc.*, 879 P.2d 772 (N.M. 1994).

Plaintiff argues that Crane Care's service technicians evinced an utter reckless disregard for the safety of Plaintiff when, during service calls to GCC, they failed to "seriously diagnose" and remedy the drifting of the crane despite knowledge of the problem. Additionally, Plaintiff claims that these service technicians were acting in a "managerial capacity," because they were given discretion as to the service work that would be performed. Defendant counters, arguing that there is no evidence that Mr. Antillon nor any other employee of Crane Care engaged in tortious conduct reaching the level of a culpable mental state supporting punitives and, further, that Crane Care's service technicians did not act in a managerial capacity.

The Court, having determined that a question of fact remains as to culpability, next considers whether there is an appropriate theory of liability under which Crane Care might be liable for punitive damages. In doing so, however, the Court need not resolve the issue of whether Crane Care's service technicians acted in a "managerial capacity," because it concludes that Plaintiff has created a genuine issue of material fact as to whether Crane Care authorized, ratified, or participated in culpable conduct of its service technicians.

Plaintiff has presented some evidence that members of upper-management at Crane Care were aware that the crane at GCC had an ongoing drifting problem yet failed to remedy it through its service technicians or otherwise. Again, according to the testimony of Mr. Hackworth, either Crane Care's manager or assistant manager told him that the crane had

been drifting "for about a year . . . ever since they installed the conversion" on the crane. Under these facts, viewed in the light most favorable to Plaintiff, there is a question of material fact as to corporate authorization or participation.

### IV.  CONCLUSION

For all of these reasons, the Court finds that partial summary judgment in favor of Defendant is not warranted on Plaintiff's punitive damages claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Partial Summary Judgment (Doc. 80) is hereby **DENIED**.

_____
SENIOR UNITED STATES DISTRICT JUDGE