## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF NEW MEXICO

GARY DINKEL,

       Plaintiff,

v.                                   CIV No. 09-388 LH/RHS

CRANECARE, INC.,

       Defendant.

## MEMORANDUM OPINION AND ORDER

On December 1, 2010, Defendant CraneCare, Inc. ("CraneCare") filed a Motion in Limine to Exclude Testimony by George Hackworth and Objections to the Testimony of George Hackworth (Doc. 92) as well as a Motion for Summary Judgment (Doc. 90) and Memorandum in Support (Doc. 91). The Court, having considered these motions, briefs, evidence, arguments, relevant law, and otherwise being fully advised, concludes that the motion in limine should be **granted** to the extent that CraneCare seeks the exclusion of George Hackworth's opinion testimony regarding the purported lack of grounding and the cause of the crane's drifting problems, and that the motion for summary judgment should be **granted.**

## I.   FACTUAL BACKGROUND[1]

On or about September 9, 2005, GCC Rio Grande of America ("GCC") contracted with CraneCare to perform an electrical controls conversion of a Ball Mill Room Bridge Crane ("the crane") located at GCC. (Def.'s Memo. in Support of Mot. for Summ. J. (Doc. 90) ("Def.'s MSJ"), at Undisputed Fact ("UF") ¶ 2.) CraneCare's conversion of the crane included the replacement of

---

[1] The following facts are undisputed or, if disputed with admissible evidence, are construed in the light most favorable to Plaintiff, the non-moving party.

the existing cab controls with radio remote controls.  (*Id*.)  Julio Antillon of CraneCare was responsible for the installation of the remote controller system.  (*Id*. ¶ 3.)

Although CraneCare did not provide formal on-site training for GCC employees after the electrical controls conversion, employees of CraneCare did show at least some GCC employees how to operate the remote controllers and the pendant controller, which is a controller that is affixed and hard-wired to the crane.  (Def.'s MSJ, Ex. 2, at 130:6-16; 134:17-25; 135:1-3; 136:19-25; 137:11-13.)  A representative of CraneCare explained to GCC personnel the purpose of the nine buttons on the newly-installed controllers and demonstrated how to use them to change the speed of the crane.  (*Id*. 137:1-13.)   The GCC electrical team trained GCC supervisors on the operation of the controllers, and the supervisors, in turn, trained other GCC personnel.  (Def.'s MSJ, UF ¶ 7.)  According to Plaintiff, the remote controllers on the crane were similar to the controllers used with other bridge cranes at GCC and were fairly simple to use.  (*Id*.)

On January 6, 2006, after completion of the electrical controls conversion of the crane, Mr. Antillon operated the crane and performed an inspection and load test.  (*Id*. ¶ 4.)  The radio remote controller worked properly and stopped the crane each time it was tested. (*Id*.)

The installation of the equipment came with a warranty, and CraneCare was therefore responsible for making warranty calls at GCC related to the installed equipment during the warranty period.  (Def.'s MSJ, UF ¶ 8.)  GCC personnel would report any problems with the crane or remote controllers to either Michael Bohl, the Mill Team Supervisor at GCC, or to Jesus Urbina, the Electrical Supervisor at GCC.  (*Id*. ¶ 9, 10.)  Mr. Urbina would contact CraneCare regarding problems with the crane.  (*Id*.)  When contacted by GCC regarding a problem, a representative of CraneCare would make a warranty call at GCC to address it.  (*Id*.)  According to Mr. Urbina, CraneCare always immediately addressed, and satisfactorily repaired, any problems with the crane.

2

(*Id*.)  CraneCare knew that a remote control that malfunctioned or that failed to stop a crane's hoist on command would create an unsafe and dangerous risk to others.  (Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 96) ("Pl.'s Resp."), at Additional Undisputed Fact ("AUF") ¶ 17.)

According to Plaintiff, approximately three weeks to one month prior to his injuries, he experienced problems with the crane and the remote control.  (Pl.'s Resp., Ex. C, at 54:17-25; 55:1-13.)  Plaintiff estimated that these problems occurred five or six times during the course of five days. (*Id.*)  Primarily, the problem was that the hoist would not go up or down; sometimes it would not stop.  (*Id.* 55:20-21.)  Plaintiff indicated that when he and other crane operators encountered problems with the crane, they would go to the electrical supervisor, who would look at the crane or call "the contractor" out to look at it.  (*Id.* 56:13-18.)

Approximately one month prior to Plaintiff's accident, on or about January 26, 2006, GCC notified CraneCare that one of the two remote controllers would not operate the crane.[2]  (*Id.* ¶ 11.) According to Joe Vanderlugt, Vice President of CraneCare, after determining that the problem was not with the batteries, CraneCare returned the remote controller to the manufacturer.  (*Id.*)  The manufacturer repaired the remote controller by replacing the coder and returned it to CraneCare. (*Id.*)

Next, on or about February 13, 2006, CraneCare was again notified that the crane would not operate.  (*Id.* ¶ 12.)  Mr. Antillion went to GCC and determined that the batteries in the remote controller needed to be replaced.  (*Id.*)  After replacing the batteries, Mr. Antillon tested the remote controller and determined that it was working properly.  (*Id.*)

---

[2] Given the proximity in time and similarity to the problems reported by Plaintiff, it seems likely that the problem reported to CraneCare on January 26, 2006, which Crane Care addressed by sending the remote controller to the manufacturer, is redundant to the problems recounted by Plaintiff.

3

Nine days later, on February 22, 2006, GCC contacted CraneCare about a problem with the crane's selector switch, a switch that allows the operator of the crane to select whether the crane is controlled via remote control or via the pendant controller affixed to the crane. (Def.'s MSJ, UF ¶ 13); (Def.'s MSJ, Ex. 1, at 59:18-25; 60:1-3.)  Mr. Antillon determined that fine cement dust had worked its way into the electrical components of the switch, impairing its operation. (Def.'s MSJ, UF ¶ 13.)  Mr. Antillon replaced the selector switch and tested the crane using both the remote controller and the pendant controller. (*Id.* ¶ 14); (Def.'s MSJ, Ex. 1, at 50:5-10.)  According to Mr. Antillon, the crane "went through its normal parameters of functions." (Def.'s MSJ, UF ¶ 12.)

The next day, on February 23, 2006, Plaintiff was working with the crane to remove a mill manhead. (*Id.* ¶ 17.)  Plaintiff was the rigging person in charge and was giving signals to the crane operator, Orlando Sanchez. (*Id.*)  Operators of the crane apply pressure to the up or down button of the remote in order for the hoist to travel up or down. (*Id.* ¶ 6.)  To stop the hoist, the operator releases the pressure on the button and the hoist stops. (*Id.*)  The emergency (or "E-stop") button, however, shuts down the crane and all of its functions. (*Id.*)

According to Plaintiff, early in the morning on February 23, 2006, the remote controller did not properly move the hoist up or down, and Mr. Urbina, the Electrical Supervisor at GCC, called "the people that installed the remote." (Def.'s MSJ, Ex. 4, at 58:1-4.)  Someone came out to GCC to look at the crane that morning, but Plaintiff could not identify them. (*Id.* 58:7-12.)  Meanwhile, Mr. Bohl directed Plaintiff to a different project away from the crane. (*Id.* 58:15-17.)  Eventually, Mr. Bohl instructed Plaintiff to return to his work on the crane. (*Id.* 58:15-18.)

According to Plaintiff, Mr. Sanchez, the crane operator, began moving the hoist up without Plaintiff's signal. (Def.'s MSJ, UF ¶ 19.)  Plaintiff signaled Mr. Sanchez to move the hoist to the

4

east and up to become vertical. (*Id.*) The hoist with the cable or choker must be vertical or perpendicular with the manhead; if the hoist gets too far from the cover, or at too much of an angle, the operator should not do the pick until it is corrected. (*Id.* ¶ 18.) Mr. Sanchez started moving the hoist east. (*Id.*) As Mr. Sanchez was going up with the hoist using the remote controller, there was slack in the cable. (*Id.* ¶ 20.) Plaintiff put his hand on one of the cables to push the shackle. (*Id.* ¶ 21.) Plaintiff tried to slow Mr. Sanchez, but the hoist kept moving up at normal speed. (*Id.* ¶ 20.) Plaintiff gave Mr. Sanchez the signal to stop, and, according to Plaintiff, Mr. Sanchez hit the E-Stop button on the remote controller, but the hoist would not stop. *Compare* (Def.'s MSJ, UF ¶ 20) *with* (Pl.'s Resp. ¶ 6). Plaintiff's fingers were caught in the cable as it twisted, resulting in the partial amputation of some of his fingers and injuries to his shoulder. (Def.'s MSJ, Ex. 5, at 58:15-18.)

Just after Plaintiff's injury, Miguel Estrada, who was working nearby Plaintiff, observed that the cable was at an angle and that it was not straight with the manhead, but was off to the east. (*Id.* ¶ 33.) After the accident, Mr. Sanchez was able to use the remote controller to lower the hoist. (*Id.* ¶ 27.) GCC supervisors who responded to the accident scene also used the remote controller to test and run the crane, finding no problems. (*Id.*)

Plaintiff was not wearing gloves at the time of his injury. (Def.'s MSJ, UF ¶ 21.) GCC did not require riggers to wear gloves; however, during safety talks with personnel, GCC recommended that they do so.[3] (*Id.* ¶ 23-24.) Additionally, GCC personnel were advised that they should stand

---

[3] Plaintiff argues that this fact is not relevant to his negligence claims against CraneCare; however, CraneCare asserts that the Plaintiff's failure to wear gloves, in light of GCC's recommendations that they be worn, was an operator error that was reasonably connected as a significant link to Plaintiff's injury.

back to allow tension to be taken out once the rigging was set, keeping their hands off of the cable.[4] (*Id.* ¶ 23.)

Shortly after the accident, Mr. Bohl, the Mill Team Supervisor at GCC, conducted an investigation of the accident on behalf of GCC.  (*Id.* ¶ 28.)  In a written report, he concluded that the significant causes of the accident were as follows: 1) "the crane operator made an action with the crane without proper signals from the rigger [,]. . . the crane was not properly centered over the work and the crane operator was not positioned properly to observe the rigger for signals;" and 2) "the rigger put his fingers between a pinch point while holding onto the cable [and] failed to verify that the crane operator could see his signals at all times and to properly remove any twisting of the two cables."  (Def.'s MSJ, Ex. 5, at 80:22-25; 81:5-24; 83:4-16.)  At his deposition, Mr. Bohl testified that there were many conflicting stories, and that when he prepared the report he "still was unclear as to really what happened."  (*Id.* 81:14-17.)  Nevertheless, he maintained that his investigation did not reveal any defects or malfunctions with the crane or the remote.  (*Id.* 84:7-12.)

Mr. Antillon, the CraneCare service technician who installed and tested the remote controller system, who replaced batteries in one remote controller, and who replaced the crane's selector switch, testified that prior to the accident involving Plaintiff, he had not heard and was not otherwise aware of any problem with the crane's hook or hoist failing to stop when the remote control system was being used.[5]  (Def.'s MSJ, Ex. 1, at 48:18-25; 49:1-10.)  At the time of his service calls to GCC,

---

[4] Once again, Plaintiff argues that this fact is not relevant to his negligence claims against CraneCare. CraneCare contends that Plaintiff's failure to keep his hands off of the cable, in light of GCC's recommendations that he do so, was an operator error that was reasonably connected as a significant link to Plaintiff's injury.

[5] Plaintiff attempts to dispute Mr. Antillon's testimony that he was not aware of a drifting problem prior to Plaintiff's accident by referring the Court to the deposition testimony of George Hackworth.  Even viewing the evidence in the light most favorable to Plaintiff, the referenced testimony of Mr. Hackworth does not directly

there was no indication to him of a drifting problem when operating or testing the crane.  (*Id.*)

Additionally, neither Mr. Bohl nor Mr. Urbina of GCC recalled any problem with the crane's remote

controllers, other than the problem with the batteries.  (*Id.* ¶ 15, 16.)  Mr. Urbina testified

specifically that he was not aware of any problem in which GCC personnel had problems getting

the hoist to stop or to move up or down.  (*Id.* ¶ 15.)  Likewise, Joe Vanderlugt, CraneCare's Vice

President, testified that prior to the accident he had not heard about any problems with the remote

not stopping the crane.  (Def.'s MSJ, Ex. 2, 89:13-23.)

On the other hand, George Hackworth, a former service technician with CraneCare, testified

that the crane did have "a problem with drifting," such that the up and down hoist did not stop

moving when the operator stopped pressing the directional buttons on the remote controller.  (Pl.'s

Resp., Ex. B, at 7:14-24.)  At some point, Mr. Hackworth personally observed the crane drift after

it should have stopped, though it is unclear whether he made this observation before or after

Plaintiff's accident.[6]  (*Id.* 15:4-5).  In any event, Mr. Hackworth was not sent to GCC to address the

crane's drifting problem until May 19, 2006, and May 22, 2006, three months *after* the accident

involving Plaintiff.  *Compare* (Def.'s Reply, Ex. 6, at 14:20-25; 15:1-5; 23:17-24; 24:14-20) *with*

(Second Amended Complaint ¶¶ 25- 29).  He was told by either the manager or assistant manager

of CraneCare that the crane had been drifting "for about a year . . . ever since they installed the

---

contradict Mr. Antillon's testimony that he was not aware of drifting problems with the crane prior to the accident involving Plaintiff.

[6]  Mr. Hackworth's testimony in this regard is equivocal.  When asked whether he had observed the drifting before being sent out in May 2006, he testified "Not, not really not that I could – that I can remember.  I don't know.  I mean, I had – I saw it do it.  I saw what the problem was, but I can't really remember.  I mean going out there a lot on it myself." (Pl.'s Resp., Ex. B, at 17:6-12.)

conversion."[7]  (Pl.'s Resp., Ex. B, at 15:6-24.)

After troubleshooting the crane at GCC in May 2006, again approximately three months *after* Plaintiff's accident, Mr. Hackworth testified that he discovered that the signal wires that were necessary to communicate the commands of the remote control to the crane motor had never been properly grounded.  (Pl.'s Resp., Ex. B, at 31:13-16.)  According to Mr. Hackworth, because the shielding material for the signal wires was never properly grounded, the signal leaked out and was not able to make a complete circuit in communicating between the remote control and crane motor. (*Id.* 9:13-18; 32:11-22.)  When asked whether it appeared that the cable had been grounded but then came loose, Mr. Hackworth responded, "No. As far as I knew, it hadn't been grounded at all out there on the motor side." (*Id.* 31:13-16.)  Mr. Hackworth testified that when he properly grounded the wires, it resolved the crane's drifting problem. (*Id.* 10:2-4.)[8]

---

[7] As noted in this Court's December 9, 2010 Memorandum Opinion and Order, under Fed. R. Civ. P. 801(d)(2), a statement offered against a party that is a "statement by the party's agent or servant concerning a matter within the scope of agency or employment, made during the existence of the relationship" constitutes non-hearsay. Fed. R. Civ. P. 801(d)(2).  Although it is not possible to determine conclusively from the deposition transcript excerpt who told Mr. Hackworth that the drifting problem had been occurring since the electrical controls conversion, viewing the evidence in the light most favorable to Plaintiff, the statement was made by either the manager or assistant manager of the company.  (*See* Pl.'s Resp., Ex. B, at 15:2-25.)  It would seem that the statement concerns a matter within the scope of employment for either member of the company's upper management.  *Cf. Rainbow Travel Serv. v. Hilton Hotels Corp.*, 896 F.2d 1233 (10th Cir. 1990) (holding that the district court did not abuse its discretion when it admitted a shuttle bus driver's statements concerning his employing hotel's reservation practices as statements made within the scope of the driver's agency, even though the driver was not involved in the decision-making process regarding hotel reservations).  As such, the statement constitutes non-hearsay under Fed. R. Civ. P. 801(d)(2) when offered against CraneCare.  Thus, the statement is admissible, even as evidence that the crane in fact had problems with drifting.

[8] CraneCare objects to Mr. Hackworth's testimony, including his testimony concerning the lack of grounding and resultant drifting, on the basis that Mr. Hackworth is not qualified to testify about the condition of the crane three months *after* the accident for the purpose of hypothesizing that the condition of the crane was the same in February 2006 and was the cause of Plaintiff's accident.  CraneCare argues that Mr. Hackworth's testimony exceeds the scope of permissible lay opinion testimony under Fed. R. Evid. 701.  As discussed herein, the Court agrees that Mr. Hackworth's opinion concerning the lack of grounding and resultant drifting is not permissible lay opinion testimony.  For this reason, the Court has not considered such opinions in reaching its decision on CraneCare's motion for summary judgment.

CraneCare's designated expert, Anthony F. Bond, who has experience designing aerial lifts and operating cranes, analyzed the causative factors associated with Plaintiff's accident in his initial report dated April 14, 2010, and in his supplemental report dated July 20, 2010.[9] (Def.'s MSJ, Ex. 7, 7-B, and 7-C.)  He concluded that the cause of the accident was operator errors.  (Def.'s MSJ, Ex. 7, at ¶ 3.)  More specifically, his conclusion was that Mr. Sanchez did not wait for Plaintiff's hand signals before beginning the lift, that Plaintiff did not properly direct and supervise the lift of the operation, and that Plaintiff did not provide hand signals to Mr. Sanchez to begin raising the hoist. (*Id.* ¶ 3.)  Additionally, he concluded that Mr. Sanchez moved the trolley towards the east instead of hoisting the hook upward, and that when he released the remote control button, the trolley continued moving eastward to a slow stop, which is normal operation for the overhead hoist.  (*Id.* ¶ 7.)  Mr. Bond found no evidence of any malfunction with the crane or remote controls, and concluded that drifting did not contribute to Plaintiff's accident.  (*Id.* ¶¶ 4, 6.)

There is no evidence that the E-Stop button on the remote controllers had failed either prior to the accident or after the accident.[10]  *Compare* (Def.'s MSJ, UF ¶ 37) *with* (Pl.'s Resp., UF ¶ 14). Indeed, according to Mr. Hackworth, when he was working to address the drifting problem with the crane, he "knew for a fact that the E-stop *did* work as far as killing power."  (Defendant's Motion in Limine, Ex. A, at 22:4-6) (emphasis added).

---

[9] Plaintiff does not challenge Mr. Bond's credentials as an expert witness on the operation of cranes, but instead argues that "Defendant's expert witness provides a theory that simply does not support the overweighing evidence of testimony given by numerous witnesses."  (Pl.'s Resp. ¶ 12.)

[10] Plaintiff does not directly dispute CraneCare's statement of fact that there was no evidence that the E-Stop button on the remote controllers had failed either prior to the accident or after the accident.  Rather, he merely claims that CraneCare is trying to "lay evidence of an unsupportable theory."  (Pl.'s Resp. ¶ 14.)

II.     **STANDARDS OF REVIEW**

   **A.  Motion in Limine**

   The district court is granted broad discretion in determining the admissibility of evidence, including whether a lay witness is qualified under Fed. R. Evid. 701 to testify to a matter of opinion. *United States v. Stanley*, 896 F.2d 450, 452 (10th Cir. 1990).  Generally, a court's ruling on a motion in limine is reviewed for abuse of that discretion.  *See United States v. Gutierrez-Gonzalez*, 184 F.3d 1160, 1164 (10th Cir. 1999).

   **B.  Motion for Summary Judgment**

   An important function of summary judgment is to eliminate factually-unsupported claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Id.* (internal quotations omitted).

   Initially, the moving party bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993).  Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.*  The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.*  There is no issue for trial unless there is sufficient evidence favoring

10

the nonmoving party for a jury to return a verdict for that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.   LEGAL ANALYSIS

Plaintiff has asserted a negligence claim against CraneCare.  He argues that CraneCare was negligent in its installation of the crane and remote control, in its repair and maintenance of the crane and remote control, in failing to comply with applicable OSHA standards, in failing to provide appropriate warnings and instructions regarding the crane and remote control, and in providing faulty equipment for the use and maintenance of the crane.  (Second Amended Complaint to Recover Damages for Personal Injury, Doc. 8, at ¶ 109.)  CraneCare has filed a motion in limine seeking the exclusion of George Hackworth's testimony as well as a motion for summary judgment.

Because this is a diversity case, the Court applies state substantive law – that is, New Mexico law – and federal procedural law.  *See Hanna v. Plumer*, 380 U.S. 460, 465 (1965).  The Court is governed by the Federal Rules of Evidence regarding expert testimony.  *See Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 883 (10th Cir. 2006).  However, whether a plaintiff must provide expert testimony to establish the elements of his claim is a matter of New Mexico substantive law.  *See Redland Soccer Club, Inc. v. Dep't of Army*, 55 F.3d 827, 852 (3d Cir. 1995).

### A.  Motion in Limine

In its motion in limine, CraneCare seeks the exclusion of George Hackworth's testimony, arguing that it is not relevant and that it exceeds the scope of permissible lay testimony.  Plaintiff, on the other hand, contends that a lay witness such as Mr. Hackworth may provide testimony of a specialized or technical nature if he has particular knowledge by virtue of his experience (even if the subject matter is specialized or technical), and that such testimony is based upon the witness'

personal knowledge.  Plaintiff urges the Court to allow the testimony of "the only witness that can

provide testimony to the extent of his first-hand knowledge as to the cause of the drift."

Plaintiff did not disclose Mr. Hackworth as an expert witness under Fed. R. Civ. P. 26(a)(2);

thus, there is no dispute that the only testimony which he may offer is testimony appropriate for a

lay witness.  Plaintiff maintains that Mr. Hackworth's testimony is proper lay witness testimony

under Fed. R. Evid. 701.  Rule 701 provides as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of
> opinions or inferences is limited to those opinions or inferences which are (a)
> rationally based on the perception of the witness, (b) helpful to a clear understanding
> of the witness' testimony or the determination of a fact in issue, and (c) are not based
> on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

Subsection (c) of Rule 701 expressly prohibits the admission of lay witness opinion

testimony if it is based on specialized or technical knowledge.  This third requirement of Rule 701

was added by amendment in 2000 "to eliminate the risk that the reliability requirements set forth

in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness

clothing."  *United States v. Banks*, No. 07-5010, 2008 WL 276053, at *5 (10th Cir. Feb. 1, 2008)

(quoting Rule 701 Adv. Comm. Notes (2000 Am.)).

The testimony of Mr. Hackworth, relied upon by Plaintiff in his Response to CraneCare's

motion for summary judgment, includes his opinion as to why and how a lack of grounding of the

crane's encoder caused the hoist of the crane to drift.  (*See* Pl.'s Resp., Ex. B, at 9:11-21; 54:1-3, 8-

14; 56:4-25; 57:1-13.)  Specifically, Mr. Hackworth suggested that noise, radio signals, or high pitch

frequency interfered with the encoder to cause the crane to drift.  (*Id.* 51:2-23.)  Mr. Hackworth

opined that the shielding and grounding wires had not merely come loose, but that they were never

grounded by CraneCare in the first place. (*Id.* 45:4-17; 52:1-24; 53:12-25.) Furthermore, he testified that the crane was not designed to drift. (*Id.* 54:8-14.)

Plaintiff regards this testimony as proper lay witness testimony, arguing that Mr. Hackworth should be permitted to testify as to his personal observations of the malfunctions of the crane and why the crane was malfunctioning. In his response brief, Plaintiff cites nine different cases to support the proposition that a witness who could be, but is not, designated as an expert may still testify based on knowledge gained from his industry experience. Plaintiff relies principally upon *Hartzell Mfg., Inc. v. Am. Chem. Techs., Inc.*, 899 F. Supp. 405, 408 (D. Minn. 1995), in which the court held that "perceptions based on industry experience is a sufficient foundation for a lay opinion," and on *Buckman v. Bombardier Corp.*, 893 F. Supp. 547, 561 (E.D.N.C. 1995), in which the court allowed employees of the defendant manufacturer to offer lay witness opinions as to the operational characteristics of the watercraft at issue there. (Pl.'s Resp. Motion in Limine 5-8.) It is telling, however, that none of the cases cited by Plaintiff is a Tenth Circuit or District of New Mexico case.

Early on, it was unclear whether the Tenth Circuit would permit a lay witness' specialized or technical industry experience to serve as a foundation for a lay opinion under Rule 701. In *Randolph v. Collectramatic, Inc.*, 590 F.2d 844 (10th Cir. 1979), the court determined that a lay witness could not opine regarding the defective design of a pressurecooker because no foundation was laid for such an opinion. *Id.* at 848. *Randolph* left open the question of whether a lay witness could have so opined provided that the proper foundation had been laid. The court mentioned *Farner v. Paccar, Inc.*, 562 F.2d 518 (8th Cir. 1977), a case in which the Eight Circuit permitted technical opinion testimony regarding the design of a suspension system from a lay witness, but it

found the case distinguishable.  *Randolph*, 590 F.2d at 847.

In its independent research, the Court has discovered that, more recently, the Tenth Circuit has clarified that "a person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by an ordinary person."   *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004).   The court has, on multiple occasions, demanded the exclusion of scientific and technical opinion testimony elicited from lay witnesses, even despite a witness' relevant background and experience.  *See, e.g., id.*  (concluding that the CEO of a company could not testify as a lay witness regarding damages, because the method used was not straightforward or a matter of common sense, but rather involved "moving averages, compounded growth rates, and S-curves"); *see also Banks*, 2008 WL 276053, at *6 (concluding that a narcotics officer's opinion that the defendant was engaged in drug dealing was based on his specialized training and experience and, thus, should have been considered expert testimony under Rule 702, not lay opinion testimony under Rule 701); *Nester Comm. Roofing, Inc. v. Am. Builders and Contractors Supply Co., Inc*., No. 06-6290, 2007 WL 2962383, at *3-4 (10th Cir. Oct. 10, 2007) (concluding that a CPA not designated as an expert could "testify to his personal knowledge of events relevant to the litigation" but could not offer what amounted to an expert opinion regarding lost profits).

Plaintiff's position – that Mr. Hackworth should be permitted to testify to his personal observations of the crane malfunctioning and to why it was malfunctioning – is an oversimplification of Rule 701 and does not account for the highly-technical opinions offered by Mr. Hackworth.  "[A] witness' testimony based on his specialized training cannot simply be recharacterized as lay opinion testimony and admitted under Rule 701." *Banks*, 2008 WL 276053,

at *6.  As such, the Court will not permit Mr. Hackworth to offer opinions about the lack of grounding of the encoder or about the cause of the crane's drifting.  There can be no question that determining the cause of electrical noise and the concomitant drifting of a crane is a complex process that requires specialized, technical knowledge regarding electrical circuits.  The analysis of electrical circuits is simply not a matter of common knowledge.  Accordingly, if Plaintiff intended to rely upon Mr. Hackworth's opinions concerning a lack of grounding in order to establish causation, he should have designated him as an expert in the area.

Finally, there is no dispute that Mr. Hackworth is entirely without first-hand knowledge or observations of Plaintiff's accident.  This lack of personal observation renders him unable to offer an opinion or inference concerning the cause of Plaintiff's accident.  *See* Fed. R. Evid. 701.  Even in those cases relied upon by Plaintiff, where courts in other jurisdictions have permitted specialized and technical lay opinion testimony, courts have refused to permit lay witnesses to opine as to the cause of a plaintiff's injuries when they did not observe the accident at issue.  *See, e.g.*, *Buckman*, 893 F. Supp. at 562 (permitting lay opinions regarding the operational characteristics of Sea-Doo watercrafts, but disallowing testimony by lay witnesses who did not observe the accident in question as to its cause).

Although Mr. Hackworth has not offered a direct and obvious opinion that the lack of grounding caused Plaintiff's accident, Plaintiff seeks to imply through his testimony that a lack of grounding and resultant drifting was indeed the cause of Plaintiff's accident.  But the Court questions how Mr. Hackworth's testimony can be probative of causation, or provide any assistance to the jury, given his utter lack of personal knowledge of the condition of the crane at the time of Plaintiff's accident.  Notably, Mr. Hackworth observed the condition of the crane *three months after*

15

Plaintiff's accident, and Plaintiff has failed to present any evidence concerning the use, treatment, or changes to the crane in the interim.  Accordingly, it would be improper for the Court or a jury to rely upon Mr. Hackworth's opinion and testimony to hypothesize that a drifting problem caused by a lack of grounding was present at the time of the accident and that it was in fact the cause of Plaintiff's accident.

For all of these reasons, the Court concludes that CraneCare's motion in limine will be granted to the extent that it seeks exclusion of Mr. Hackworth's opinion testimony concerning the lack of grounding and the cause of the crane's drifting.  The question becomes, then, whether Plaintiff may survive summary judgment without the Rule-701-offending opinion testimony of Mr. Hackworth.

### B.  Motion for Summary Judgment

In its motion for summary judgment, CraneCare argues that there is no evidence that CraneCare negligently repaired or maintained the crane or the remote controllers or that any act or failure by CraneCare was the proximate cause of Plaintiff's injury.  To the contrary, CraneCare suggests that the only competent evidence before the Court establishes that Plaintiff's accident was caused by operator errors alone.  Plaintiff, on the other hand, maintains that he has presented sufficient evidence that CraneCare knew of, and even caused, the drifting problem with the crane that ultimately resulted in Plaintiff's injuries and that it failed to exercise reasonable care to avoid the risk of serious injury.

An act or omission may be a proximate cause of an injury if it contributes to bringing out the injury, if the injury would not have occurred without it, and if it is reasonably connected as a significant link to the injury.  *Talbott v. Roswell Hospital Corp.*, 118 P.3d 194, 201 (N.M. Ct. App.

16

2005).  Generally speaking, proximate cause is a question of fact to be determined by the fact-finder.  *Pollock v. State Highway and Trans. Dept.*, 984 P.2d 768, 773 (N.M. Ct. App. 1999).  "The only time this is not true is 'when facts regarding causation are undisputed and all reasonable inferences are plain, consistent and uncontradictory.'"  *Id.* at 773-74.  To avoid summary judgment, Plaintiff must come forward with facts from which CraneCare's negligent cause of the accident "may be reasonable inferred."  *See id.* at 774.  A burden rests upon Plaintiff to "introduce evidence to remove the cause from the realm of speculation and to give it a solid foundation upon facts."  *See Sanders v. Atchison, Topeka & Santa Fe Railway Co.*, 336 P.2d 324, 326-27 (N.M. 1959).

CraneCare's designated expert, Mr. Bond, has opined in his affidavit that Plaintiff's accident was caused by operator errors and that no malfunction of the crane or the remote control contributed to the accident.[11]  CraneCare notes that Plaintiff has failed to come forward with any expert opinion to refute Mr. Bond's conclusion, arguing that Plaintiff's failure to designate a causation expert means that he has failed to establish a breach of the standard of care.  Relying upon professional negligence case law, CraneCare suggests that "[w]hen professional activities, peculiarly within the knowledge of such professionals are alleged to have been performed negligent, New Mexico law demands expert testimony to establish the appropriate reasonable standard of care."  CraneCare reasons that because improper grounding, electrical noise, and drifting are not within the common knowledge or experience of a layman, New Mexico law requires that alleged breaches must be measured using expert testimony about professional standards.  However, it is not clearly Plaintiff's burden to provide such expert testimony.

---

[11] The Court notes that the Tenth Circuit has approved the policy of considering the testimony, in the form of affidavits, of experts who have not been formally qualified as such at the summary judgment stage.  *See Morganroth & Morganroght v. DeLorean*, 213 F.3d 1301, 1311 (10th Cir. 2000).

Whether a plaintiff must provide expert testimony to establish the elements of his claim is a matter governed by the state's substantive law, *Redland Soccer Club, Inc*., 55 F.3d at 852, and New Mexico courts have not directly addressed whether a negligence claim against a company responsible for installing and servicing equipment requires expert testimony concerning the standard of care.  In contrast, New Mexico courts have generally required expert testimony in professional malpractice actions, including actions against medical doctors, lawyers, and architects.  *See Pharmaseal Labs, Inc. v. Goffe,* 568 P.2d 589, 594 (N.M. 1977) (medical doctors)*; Rodriguez v. Horton,* 622 P.2d 261, 264 (N.M. Ct. App. 1980) (lawyers)*; Adobe Masters, Inc. v. Downey*, 883 P.2d 133, 135 (N.M. 1994) (architects).

This Court declines, in the context of the present matter, to expand the class of cases for which expert testimony is generally required under New Mexico law, or to characterize the present case as a professional malpractice action.  *See Wheeler Peak*, *LLC v. L.C.I.2, Inc.*, No. 07-117 JB/WDS, 2010 WL 611026, *5 (D.N.M. Jan. 31, 2010) (holding that the plaintiff did not have to provide expert testimony to establish negligence in a contractor liability case, because it was not a malpractice action against a professional).  As such, the mere failure to designate an expert alone does not justify summary judgment in CraneCare's favor, so long as Plaintiff presents admissible causation evidence to create a genuine issue of material fact.

 Concisely, the *admissible* evidence Plaintiff has presented relevant to causation is as follows:

Approximately three weeks to one month before Plaintiff's accident, Plaintiff experienced problems with the crane and remote control, where the hoist would not go up or down and sometimes would not stop.  In January and February of 2006, CraneCare made several warranty

calls to GCC to address various problems with the crane and remote controllers, including returning one of the two remote controllers to the manufacturer for repairs when the remote would not operate the crane, replacing the batteries in a remote controller when the crane would not operate, and replacing the selector switch on the crane when the switch would not operate properly. Early on the morning of the accident, the remote controller did not properly move the hoist up or down, and CraneCare was contacted. After someone came out to look at the crane, Plaintiff resumed his rigging work with it. However, when the crane operator hit the E-Stop button on the remote controller, the hoist did not stop, and Plaintiff's fingers were caught in the cable and partially amputated. Then, three months after the accident, George Hackworth, a service technician with CraneCare at the time, was sent to GCC to address a drifting problem with the crane. Mr. Hackworth personally observed, either before Plaintiff's accident or afterward, the crane drift after it should have stopped.

In reviewing a motion for summary judgment, the Court is permitted to consider only that evidence which is admissible at trial. *See Harrison v. Eddy Potash, Inc.*, 248 F.3d 1014, 1021 (10th Cir. 2001). As discussed with regard to CraneCare's motion in limine, opinion testimony from Mr. Hackworth concerning the lack of grounding and the cause of the crane's drifting is not admissible testimony under Fed. R. Evid. 701, and it is therefore disregarded in the Court's analysis of the pending motion for summary judgment. Even so, this ruling on CraneCare's motion in limine does not exclude all relevant testimony offered by Mr. Hackworth.

In its December 9, 2010 Memorandum Opinion and Order,[12] the Court considered the

---

[12] Although the Court held in its previous Memorandum Opinion and Order that Plaintiff had presented sufficient evidence of culpability to avoid summary judgment on his punitive damages claim – that is, that there was some evidence that CraneCare was aware of a drifting problem with the crane – the scope of that opinion was

admissibility of statements made to Mr. Hackworth by the manager or assistant manager of CraneCare regarding the length of time that the crane had a problem with drifting.   More specifically, Mr. Hackworth testified that either the manager or assistant manager told him that the crane had been drifting for "about a year . . . ever since they installed the conversion."   Mr. Hackworth described the drifting problem as follows: "The up and down hoist was not stopping – at the position that it was requested to stop.   You're pushing down . . . on the remote and let you finger off the button, sometimes it would still – still come down."   (Pl.'s Resp., Ex. B, at 7:19-24.)

Plaintiff makes much of the Court's suggestion in a footnote that the manager or assistant manager's statements to Mr. Hackworth constitute some evidence that the crane in fact had a drifting problem and that CraneCare was aware of it.   Nevertheless, even assuming that CraneCare was aware of a drifting problem with the crane, Plaintiff must still come forward evidence that drifting was the cause of Plaintiff's accident.   But there remains a significant disconnect in the causation evidence relied upon by Plaintiff in support of his negligence claim.

Principally, Plaintiff describes a failure of the E-Stop button on the remote controller at the time of his accident, rather than continued movement of the hoist, or "drifting," after letting off on the remote's directional pad as described by Mr. Hackworth.   Yet Plaintiff effectively concedes, by failing to directly dispute, that there is no evidence that the E-Stop button on the remote controller had failed either prior to the accident or after the accident.   Even Mr. Hackworth testified that he knew for a fact that the remote's E-stop button worked to kill the power to the crane.

---

limited and rested upon the assumption that Plaintiff could present evidence of its underlying negligence claim, including causation.  Having now considered the evidence that Plaintiff relies upon to establish causation, much of it impermissible lay opinion testimony, the Court now concludes that Plaintiff lacks sufficient causation evidence to withstand summary judgment.

This internal conflict in the causation evidence offered by Plaintiff renders his theory of causation untenable, given that he otherwise lacks evidence from which a reasonable inference of causation might be made.  Without admissible evidence suggesting that a particular act or omission by CraneCare was reasonably connected as a significant link to Plaintiff's injury, a jury would be left to speculate whether something CraneCare did or did not do contributed to the accident.  Considering the admissible evidence presently before the Court, there is but one reasonable inference to be drawn: that Plaintiff's accident was the result of operator errors, not of any act or omission of CraneCare in its installation and repair of the crane, in its warnings and instructions to GCC personnel,[13] in its compliance with OSHA requirements,[14] or in its provision of equipment to GCC.

Simply put, Plaintiff has failed to designate specific facts showing that genuine issues remain as to causation.  Plaintiff admits that Mr. Hackworth was its one and only witness with first-hand knowledge of the cause of the crane's drifting, to which he attributes his injuries.  Mr. Hackworth's opinion testimony having been excluded, no issue for trial remains, as no reasonable jury could return a verdict for Plaintiff based on the admissible evidence before the Court.

## IV.  CONCLUSION

For all of these reasons, the Court finds that summary judgment in favor of CraneCare is

---

[13] There is evidence before the Court that CraneCare demonstrated to some GCC employees how to operate the remote controllers and pendant controller, which were similar to the controllers used with other bridge cranes and fairly simple to use.  Although Plaintiff argues that CraneCare failed to provide proper warnings and training to GCC personnel on how to operate the remote controllers or pendant controller, he makes no attempt to support an argument that a failure to train or warn played any role in his accident.

[14] There is not a shred of evidence before the Court that CraneCare failed to comply with applicable OSHA standards.

warranted.

**IT IS THEREFORE ORDERED** that CraneCare's Motion in Limine (Doc. 92) is **GRANTED IN PART** and otherwise moot, and that its Motion for Summary Judgment (Doc. 90) is hereby **GRANTED**.

_____

SENIOR UNITED STATES DISTRICT JUDGE